In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2424

LAENISE ARNETT,

*Plaintiff-Appellant*,

*v.*

MICHAEL J. ASTRUE,
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:10-CV-226 RLM—**Robert L. Miller, Jr.**, *Judge.*

ARGUED DECEMBER 14, 2011—DECIDED APRIL 2, 2012

Before POSNER, MANION, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Laenise Arnett suffers from a number of medical problems, including peripheral vascular disease, chronic obstructive pulmonary disease, osteoarthritis, obesity, vascular dementia, depression, panic disorder, and anxiety. As a result, she sought Disability Insurance Benefits ("DIB") from the Social Security Administration ("SSA"), but she was unsuc-

cessful before the agency. After the Appeals Council denied review of the Administrative Law Judge's adverse decision, she sought review in the district court pursuant to 42 U.S.C. § 405(g). Once again, she did not prevail. She now appeals to this court, seeking to persuade us that the Administrative Law Judge ("ALJ") failed properly to assess her residual functional capacity. We agree with her, and so we remand her case to the agency for further proceedings.

## I

Arnett applied for DIB in June 2004, claiming an onset date of June 14, 2002. After the SSA denied her application, she requested a hearing before an ALJ. Arnett, who was 45 at the time, asserted that the array of medical ailments we described earlier made it impossible for her to work. Her application described her past work as a sorter and inspector at a factory from 1991 to 1992, as a newspaper sorter from 1994 to 1996 or 1997, as a home healthcare aide from 1998 to 1999, and as a certified nursing assistant from 2001 to 2002. After surgery in June 2002 and through most of 2003, she worked eight hours per week as a certified nursing assistant. Sometime around the end of 2003, she found that she was unable to continue.

In December 2004 Arnett updated her application with information about the recent removal of a vein from one of her legs, a procedure that left her with pain and swelling. She added that after experiencing a "mini stroke" she also was having more difficulty with balance and expressing her thoughts. Arnett and her husband

(who submitted a written statement describing how Arnett's medical condition impeded her daily activities) both asserted that Arnett could care for herself and do light housework at a slow pace, but that she sometimes was unable to do laundry or shop for groceries. An SSA employee interviewed her around this time and reported that Arnett did not appear to be experiencing any debilitating problem.

Arnett had submitted most of her medical records from 2002 through 2004 by the time she requested a hearing before an ALJ in May 2005. These records show that she visited Dr. Fred Rasp, a pulmonologist, several times in late 2001 complaining of wheezing, coughing, and chest tightness, and that she was diagnosed with an obstructive lung defect and early emphysema. About a month later, Arnett went to Parkview Hospital twice; the first time she was seen in the emergency room for complaints of chest pain and nausea and was diagnosed with early emphysema and chronic obstructive pulmonary disease ("COPD"), and during the second visit for a cardiology consultation she complained of chest pain and shortness of breath and was diagnosed with peripheral vascular disease ("PVD") and obesity. Several months later her PVD was described as "severe." To address her PVD, Arnett underwent aortobifemoral bypass surgery in June 2002. She began complaining of swelling and cramping in her legs later that year.

In the spring of 2003 Arnett had an MRI, which revealed degenerative disc disease in two thoracic vertebral discs and mild degenerative facet arthritis in her

lumbar vertebra. While checking up on Arnett in late 2003, Dr. Rasp confirmed the cardiologist's opinion that she suffers from PVD. About six months later a thoracic surgeon noted increased stenosis in some arteries. Shortly thereafter, in July 2004, Arnett underwent a balloon angioplasty. A few months later she was again dealing with stenosis and still complaining of leg pain, which her doctors addressed with several procedures including a second angioplasty. Arnett continued to complain of leg cramping and weakness afterward.

Several other physicians also had submitted consultation reports by the time Arnett requested a hearing. Dr. Galen Yordy, a consulting psychologist who met with Arnett, diagnosed her with anxiety disorder, panic disorder, and depressive disorder. Dr. Jaya Karnani, a consulting physician who practices family medicine and met with Arnett, opined that Arnett's anxiety is controlled effectively with medication and had not caused her trouble concentrating or with social interactions. On the negative side, he found that Arnett has emphysema and PVD that prevent her from standing or walking for more than two hours per day. Dr. Kenneth Bundza, a consulting psychologist who met with Arnett, found that she was alert but was experiencing difficulty retrieving information from memory; he diagnosed her with vascular dementia with depressed mood. Dr. Yaroslev Pagorelov, a consulting family-practice physician who had met with Arnett, opined that Arnett suffers from emphysema, PVD, anxiety, and right-ankle swelling and inability to walk more than five minutes or stand more than 10 minutes at a time. Two sets of state-

agency physicians also evaluated Arnett's records. The first two opined that Arnett suffers from depressive, panic, and anxiety disorders, though none of them severe. The second two opined that Arnett has emphysema and PVD, and that she occasionally can lift or carry 20 pounds, can frequently lift or carry 10 pounds, can stand or walk for at least two hours per day, and can sit for about six hours per day.

Arnett submitted more medical records to the ALJ in April and May 2007, mostly for treatment received in and after 2005. One set related to her second angioplasty in late 2004 and its failure to resolve her problems. These records document that Arnett continued to complain of pain in her legs and began experiencing pain in her right arm, and that her vascular surgeon did not believe the pain was of vascular origin and was unsure of the cause. In late 2005, Arnett's arteries were again blocking up due to stenosis, and so she underwent a third angioplasty.

Because Arnett continued to complain of pain in 2005 and 2006, her vascular surgeon referred her to a neurologist, who diagnosed her with lumbosacral neuritis but did not find a neurological explanation for Arnett's leg and arm pain. She also saw a rheumatologist, who thought that her leg pain was not a result of a rheumatological impairment and that her arm pain was probably from tennis elbow. Dr. Anantha Reddy, who specializes in physical medicine and rehabilitation, suggested that Arnett's leg pain could be a result of a spinal problem.

Late in 2006, Arnett complained of pain in her lower back, hips, and right arm and hand. X-rays showed narrowing of Arnett's left and right knee joint spaces, and Arnett's rheumatologist diagnosed her with osteoarthritis and stenosing tenosynovitis (a typically painful condition that involves a finger becoming stuck in a bent position, and later snapping back into a straight position). Arnett was experiencing blockage in some of her arteries again in spring 2007, and underwent a fourth angioplasty.

Several of Arnett's treating physicians submitted reports of her residual functional capacity ("RFC"). Arnett's primary physician (until 2006) opined that Arnett cannot lift or carry even 10 pounds, cannot stand or walk for even two hours in an eight-hour workday, and must periodically alternate between sitting and standing. Dr. Don Stallman, her current primary physician, concluded that Arnett can sit for up to 20 minutes at a stretch and for two hours total during the day, stand continuously for 15 minutes but no more than one hour total during a day, walk 30 feet before stopping, and carry up to five pounds frequently but not more than 10 pounds even occasionally. Dr. Rasp, Arnett's treating pulmonologist, concluded that she can sit for up to eight hours at a time, can stand continuously for two hours and a total of four hours per day, and walk for 15 minutes at a time and two hours total in a workday.

At the hearing before the ALJ on May 31, 2007, Arnett and a vocational expert testified. Arnett said that her legs cramped and she experienced difficulty breathing

when she had tried to work as a health aide after her 2002 aortobifemoral bypass surgery. She reported that she still has cramping and weakness in her legs as a result of her PVD, and this makes it difficult to stand for more than 20 minutes at a time. The osteoarthritis in her hips, arms, and back makes it difficult for her to sit for very long, and she believed that her osteoarthritis had been getting worse. Her COPD at times causes chest pains and typically leaves her tired, light-headed, dizzy, and short of breath. She also testified that her hands cramp and that sometimes she has trouble concentrating. The vocational expert ("VE") opined that no job would be available for Arnett if the ALJ fully credited her testimony. But, the VE continued, if Arnett can perform sedentary work, with the limitation that the job must permit alternating between sitting and standing throughout the workday, then she can work as a food service order clerk, a bench worker (there are several types in the Dictionary of Occupational Titles, but the expert did not specify which one he had in mind), or a surveillance monitor.

The ALJ found Arnett not disabled after analyzing the five steps in 20 C.F.R. § 404.1520. At Step 1, the ALJ determined that Arnett had not engaged in substantial gainful activity between the claimed onset of her disability and the date she was last insured. At Step 2, the ALJ concluded that Arnett's PVD and COPD are severe, but that her anxiety, panic, and depressive disorders are not; he did not mention her other physical and mental impairments. At Step 3, after discussing Listings 4.12 (PVD) and 3.02 (COPD), the ALJ found

that Arnett does not have an "impairment or combina-
tion of impairments" meeting or medically equaling a
listing; he did not elaborate on this conclusion or con-
sider any other specific listing.

Next, the ALJ assessed Arnett as having the RFC to
perform sedentary work with the following limitations:
carrying "up to 10 pounds occasionally and less
than 10 pounds frequently," sitting for six hours of
an eight-hour day, walking for two hours of an
eight-hour day, and alternating between sitting and
standing throughout the day. He explained this con-
clusion as follows. First, he evaluated the writ-
ten statements submitted by Arnett and her hus-
band describing her daily activities and limitations,
as well as her husband's statements to the SSA by tele-
phone about Arnett's memory problems and exhaus-
tion, and Arnett's oral testimony. But the ALJ decided
that what Arnett had said was "not entirely credible,"
and he did not address the credibility of her husband's
statements. The ALJ discussed the opinions of several
treating or consulting physicians and explained why
he accepted or rejected each. Without explanation, how-
ever, he did not mention Dr. Bundza or Dr. Yordy,
who had diagnosed Arnett with mental impairments.
Indeed, at this stage the opinion did not mention quite
a few conditions that had been presented in the
evidence: depressive, anxiety, and panic disorders; vascu-
lar dementia; lumbosacral neuritis; osteoarthritis; de-
generative disc disease; degenerative changes in her
sacroiliac joints; or finally her obesity.

Finally, in concluding his analysis at Step 4, the ALJ acknowledged that the RFC assigned to Arnett precludes her from performing her past work. This required him to move to Step 5, where the Commissioner bears the burden of proof. There, the ALJ concluded that Arnett's RFC nevertheless allows her to perform several types of jobs which, according to the VE, number in the hundreds in northeastern Indiana.

## II

On appeal to this court, Arnett takes issue with everything except the ALJ's Step 1 finding, which was in her favor. At Step 2, she says, the ALJ failed to evaluate the severity of each impairment. At Step 3, in her view, the ALJ erred by failing to evaluate her impairments collectively when he considered the listings. Third, she argues that the ALJ's RFC determination is flawed because it does not incorporate all of her impairments and limitations. Finally, she argues that the ALJ erred at Step 5 by failing to account for all of her limitations in the hypothetical given the VE. Arnett does not challenge the ALJ's decisions to give some physicians' opinions less than full weight.

Because the Appeals Council denied review, the ALJ's decision is the final decision of the agency. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). In reviewing the ALJ's decision, this court evaluates whether substantial evidence supports it. *Id.* Importantly, we must consider only the rationale offered by the ALJ. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

Arnett's Step 3 claim is not properly before this court, because she failed to raise it in the district court. *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). We therefore do not discuss it further.

All three of Arnett's other claims assert, in one way or the other, that the ALJ failed to consider the impact of all of her impairments taken together. Her arguments about Step 2 and Step 5 boil down to a contention that the ALJ overstated her RFC by making this mistake. But even if there were a mistake at Step 2, it does not matter. Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment. *Castile v. Astrue*, 617 F.3d 923, 927-28 (7th Cir. 2010). Here, the ALJ categorized two impairments as severe, and so any error of omission was harmless. See *id.* Arnett's contention that at Step 5 the ALJ constructed a hypothetical built around a flawed RFC adds nothing to her challenge to the RFC. As Arnett herself says, "[b]ecause the ALJ used a flawed RFC as the basis for the hypothetical question to the Vocational Expert . . . his hypothetical question to the VE was also flawed." Thus, Arnett's appeal comes down to whether the ALJ erred in assessing her RFC.

Arnett focuses on the ALJ's failure to consider her mental impairments in arriving at the RFC, as well as his lack of attention to her lumbosacral neuritis, obesity, osteoarthritis, degenerative disc disease, or degenera-

tive changes in her sacroiliac joints. She also contends that the RFC does not reflect her need to elevate her legs.

An ALJ must evaluate all relevant evidence when determining an applicant's RFC, including evidence of impairments that are not severe. 20 C.F.R. § 404.1545(a); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). This court upholds an ALJ's decision if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review. *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008). Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001). An ALJ must also analyze a claimant's impairments in combination. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

The ALJ did take into account Arnett's testimony that she must often elevate her legs. But after referring to her testimony, the ALJ disparaged her evidence with the all-too-common and unhelpful "not entirely credible" remark. See *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). Arnett is not challenging the credibility finding, which is just as well, since she did not raise this point in the district court. See *Shramek*, 226 F.3d at 811.

The first significant problem that we see is the ALJ's failure to incorporate adequately Arnett's mental impairments into the RFC. Dr. Yordy diagnosed Arnett

with depressive, anxiety, and panic disorders. Dr. Bundza diagnosed Arnett with vascular dementia, reporting that she had some "fairly obvious cognitive problems," including difficulty understanding directions, slowly responding to simple questions, a low-average or border-line range of intelligence, and "fairly significant retrieval problems." The ALJ discussed Dr. Yordy's diagnoses at Step 2 of the analysis, and the ALJ even says that he "translated" his Step 2 determination "into work-related functions" in assessing Arnett's RFC, but the decision offers no hint about how he did so. The ALJ never mentioned that Arnett had been diagnosed with vascular dementia. The Commissioner suggests that these omissions are unimportant, because the RFC is consistent with the limitations associated with dementia. Nothing in the ALJ's opinion explains how that may be the case, however, and the RFC makes no reference to any work limitations that would accommodate dementia. Symptoms of dementia include an inability to learn or remember new information, an inability to reason, and difficulty communicating. Mayo Clinic, Dementia: symptoms, http://www.mayoclinic.com/health/dementia/DS01131/DSECTION=symptoms (last visited March 28, 2012). Dr. Bundza's report demonstrates that Arnett was suffering from these symptoms as early as two years before the hearing. An inability to learn or remember new information could make it impossible for Arnett to be trained for a new position, and the inability to reason or difficulty communicating could make simple tasks difficult and time-consuming for Arnett to complete. Without any discussion of Arnett's

dementia, this court has no idea what the ALJ thought about this evidence. See *Clifford v. Apfel*, 227 F.3d 863, 873-74 (7th Cir. 2000); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

The ALJ also failed to take into account several of Arnett's diagnosed physical impairments. An ALJ may not ignore entire lines of evidence. See *Zurawski*, 245 F.3d at 888. The ALJ never mentioned Arnett's lumbosacral neuritis, degenerative disc disease (Arnett also refers to this as anterior disc disease), osteoarthritis, or degenerative changes in her sacroiliac joints. Arnett has complained about pain in her back, knees, and hips; this pain reduces her mobility and range of motion and makes it difficult for her to sit for long periods of time. The Commissioner argues that many of these diagnoses were provisional, were made only once, or need to be evaluated in context. But the agency's attorneys may not advance an explanation the agency never made itself and may not attempt to support the decision with evidence the agency apparently did not consider. *Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Parker*, 597 F.3d at 922, 925.

The Commissioner also argues that Arnett waived her claim that the ALJ failed to evaluate all of her physical impairments because, the Commissioner says, she has not explained how these impairments limit her ability to work. Arnett has devoted several pages of her brief to arguing that the ALJ did not fully evaluate all of her impairments. This is sufficient. See *Hernandez v. Cook*

*County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (rejecting plaintiff's contention that defendants waived immunity defense at summary judgment by limiting discussion of defense to three paragraphs).

Next, the ALJ failed to take into account Arnett's obesity. An ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments. *Martinez*, 630 F.3d at 698-99; *Clifford*, 227 F.3d at 873. The Commissioner argues that the ALJ was not required to discuss diagnoses for which Arnett failed to provide evidence of limitations. As mentioned above, however, an ALJ must consider all of the evidence and must explain its decision such that it may be meaningfully reviewed. 20 C.F.R. § 404.1545(a); *Eichstadt,* 534 F.3d at 665-66. If the ALJ thought that Arnett's obesity has not resulted in limitations on her ability to work, he should have explained how he reached that conclusion.

This error could conceivably be harmless if the ALJ indirectly took obesity into account by adopting limitations suggested by physicians who were aware of or discussed Arnett's obesity. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek*, 390 F.3d at 504. But it is not clear from the record that the limitations the ALJ adopted met that standard. The ALJ did not give full credit to the opinions of the physicians he mentioned, with the exceptions of Dr. Karnani and Dr. Rasp. Dr. Karnani noted Arnett's height and weight but she never mentioned Dr. Robertson's obesity diagnosis or demonstrated that she took that diagnosis into ac-

count. Dr. Rasp characterized Arnett as mildly obese, but referred to only Arnett's COPD-related impairments (and not her osteoarthritis) when assigning work limitations. Several other physicians specifically discussed Arnett's obesity; the ALJ, however, either discounted the opinions of these physicians or never mentioned them. On such a record, we cannot find harmless error. See *Spiva*, 628 F.3d at 353.

Last, we agree with Arnett that the ALJ failed to formulate an RFC that is sufficiently specific as to how often she must be able to sit and stand. The Commissioner argues that she waived this argument. But Arnett raised the issue of the ALJ's RFC determination overall in the district court, and this is sufficient. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) (referring to the waiver of general arguments); *Ehrhart v. Sec'y of HHS*, 969 F.2d 534, 537 (7th Cir. 1992) (referring to the waiver of "issues"). An RFC must be specific about the required frequency of standing and sitting. SSR 96-9p, 1996 SSR LEXIS 6, at *18-19 (July 2, 1996). Arnett's RFC provides that she must be able to alternate between sitting and standing "throughout the workday." This does not specify a particular frequency, and does not require that Arnett be able to choose to sit or stand when she feels it is necessary. See *Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008) (concluding that RFC specifying applicant be able to alternate between sitting and standing at applicant's option was adequate); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (same).

For these reasons, we REVERSE the district court's judgment and REMAND this case to the agency for further proceedings.