**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 24, 2019
Decided February 1, 2019

**Before**

DANIEL A. MANION, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 18-2087

| | |
|---|---|
| LAMONT D. JOHNSON,<br>    *Plaintiff-Appellant,* | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. |
| *v.* | No. 1:16-cv-01439-TWP-DML |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br>    *Defendant-Appellee.* | Tanya Walton Pratt,<br>*Judge.* |

**O R D E R**

Lamont Johnson applied for supplemental security income based on a mental impairment. An administrative law judge denied benefits after finding that Johnson did not have the deficits in adaptive functioning necessary to meet the intellectual disability Listing. The ALJ concluded that Johnson could perform unskilled work at a medium exertional level, with certain limitations. The district court upheld the ALJ's decision. Because substantial evidence supports the ALJ's determination, we affirm.

# I

Johnson, now 38 years old, underwent several intellectual-functioning examinations during elementary and junior high school. For example, in 1988, at age 8, a school psychologist administered a test and determined that Johnson's IQ was 73 and therefore in the "very low" category. When Johnson was 12, he received a verbal IQ score of 65, a performance IQ score of 81, and a full-scale IQ score of 71. Just two months later, under the Vineland Adaptive Behavior Scale (VABS), which measures personal and social skills, Johnson obtained a composite score of 56, nearly three standard deviations below the mean. That same year, Johnson had a 3.4 grade point average in his special-education classes.

In 2006, Johnson applied, unsuccessfully, for supplemental security income based on illiteracy. He saw Dr. Herbert Henry, a consulting psychologist, who administered a mental-status examination and supervised an IQ test in which Johnson had a 66 verbal IQ score, a 70 performance IQ score, and a 65 full-scale IQ score. At that exam, Johnson reported that he could not read, spell, or write, and that he had difficulty managing his money. But Johnson also stated that he knew how to drive (although he could not pass the written exam to get a license), could attend to his hygiene and dress himself without assistance, meet with friends, and play basketball.

In April 2013, at age 33, Johnson, for the third time, applied for supplemental security income based on illiteracy, alleging an onset date of June 2007. The following year, Dr. Jason Hankee, an agency examining psychologist, met with Johnson and noted that "in terms of adaptive functioning," Johnson reported his capability of maintaining personal hygiene, cleaning, using the microwave, and buying simple foods from the store. Dr. Hankee also observed that Johnson told him that he "needs help managing the finances." Johnson obtained a full-scale IQ score of 62, which was in the "extremely low" category and the 1 percentile rank. Dr. Hankee diagnosed him with "mild intellectual disability."

In November 2014, multiple witnesses testified at a hearing before an ALJ. Johnson testified about only his physical limitations, which are not at issue on appeal. Dr. James Brooks, a psychological expert, thought that "the most consistent way to evaluate" Johnson's mental status was under Listing 12.05, a regulation for intellectual disabilities that, if met, would qualify Johnson for benefits automatically. But even after reviewing Johnson's low IQ scores and reports of illiteracy, Dr. Brooks believed that Johnson could still perform simple repetitive tasks for 40 hours a week and occasionally and superficially interact with others. Finally, a vocational expert opined that a

hypothetical illiterate person performing medium work with simple and repetitive instructions and superficial interactions with others could work as a dishwasher, hospital cleaner, or janitor.

The ALJ conducted the familiar five-step analysis, see 20 C.F.R. § 404.1520(a), and denied benefits. The ALJ concluded that Johnson had not been engaged in substantial gainful activity since his alleged onset date (step one) and that his borderline intellectual functioning was severe (step two). At step three, the ALJ determined that Johnson did not meet or medically equal Listing 12.05 for intellectual disabilities. See 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A, § 12.05 (2016). The ALJ explained that though Johnson's intellectual functioning was subaverage during his developmental period, there was no support for his contention that he had (either during the developmental period or currently) the required deficits in adaptive functioning, which is essentially the ability to navigate daily challenges. See *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007). After all, the ALJ noted, Johnson could care for his personal hygiene, prepare simple meals, and had a history of performing unskilled work.

The ALJ then decided that Johnson had the residual functional capacity to perform medium work with simple and repetitive tasks and superficial or occasional interaction with others. After finding that Johnson had no past relevant work (step four), the ALJ concluded that he could work as a dishwasher, hospital cleaner, or janitor (step five). Therefore, he was not disabled. The Appeals Council denied Johnson's request for review.

Johnson sought judicial review and moved for summary judgment, arguing that substantial evidence did not support the ALJ's finding that he lacked the required adaptive functioning deficits to meet Listing 12.05. But the district court concluded that the ALJ had adequately considered Johnson's intellectual abilities and properly ruled that he did not meet the Listing. Johnson appealed.

## II

On appeal, Johnson contends that substantial evidence does not support the ALJ's finding that he did not meet the requirements for intellectual disability under Listing 12.05(C), which has since been repealed but was in effect when the ALJ rendered his decision. The Listing requires that the claimant have a: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifesting during the developmental period (ages 0–22); (2) valid verbal, performance, or full-scale IQ of 60 through 70; and (3) physical or other mental impairment imposing

an additional and significant work-related limitation of function. See 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A, § 12.05 (2016). Specifically, Johnson challenges the ALJ's decision that he did not meet the first requirement of deficient adaptive functioning, which is the "inability to cope with the challenges of ordinary everyday life." *Novy*, 497 F.3d at 710.

First, Johnson argues that the ALJ erred by ignoring his VABS score from 1992, which was nearly three standard deviations below the mean. While an ALJ, of course, may not ignore an entire line of evidence contrary to his conclusion, see *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012), he need not mention each piece of evidence, see *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Here, the ALJ did not ignore an entire line of evidence favorable to Johnson. To the contrary, the ALJ noted Johnson's teacher's statements that he was easily distracted and lacked social and communication skills; recognized Johnson's subaverage test scores in 1992, 2007, and 2014; and took account of diagnoses from multiple doctors that he had mild or borderline intellectual disability.

True, the ALJ did not discuss the VABS score, but test scores—especially old test scores (here from 1992)—are not conclusive evidence of adaptive behavior deficits when there is other, more recent evidence in the record about a claimant's daily activities and behavior. *Novy*, 497 F.3d at 710. The ALJ cited such evidence, including Johnson's reports that he could maintain personal hygiene, prepare simple meals, and perform unskilled work, and Dr. Brooks's opinion that Johnson could complete simple repetitive tasks. Moreover, the VABS score is at least 26 years old and it is difficult to see how an ALJ could have thought that it satisfied Johnson's burden to prove that he had *current* adaptive deficiencies that met the Listing. See *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). The ALJ built a logical bridge between evidence in the record and his conclusion.

Next, Johnson contends that the ALJ erred by disregarding the opinions of Dr. Henry, Dr. Hankee, and Dr. Brooks, who, he asserts, opined that he had the necessary deficits in adaptive functioning when they diagnosed him with various degrees of intellectual disability.

But the doctors did not opine that Johnson lacked adaptive functioning within the meaning of Listing 12.05. As the Commissioner notes, the opinions of Drs. Henry and Hankee had nothing to do with whether Johnson had adaptive functioning deficits that were severe enough to meet Listing 12.05. Dr. Henry observed that Johnson had IQ scores in the "mild mental retardation range," "extremely low" range, and the "borderline" range. Dr. Hankee noted Johnson's reports about adaptive functioning but opined only that Johnson had "mild intellectual disability" because of his "extremely

low" IQ. These are diagnoses and descriptors related to intelligence, not opinions about adaptive functioning. A person can have a low IQ and still be able to work, which is why evidence of deficient adaptive functioning is required for a person to be considered legally disabled. See *Hall v. Florida*, 572 U.S. 701, 722 (2014); *Novy*, 497 F.3d at 709.

In contrast, Dr. Brooks opined about adaptive functioning, and his opinion did not identify substantial deficits. Dr. Brooks determined that Johnson could perform simple repetitive tasks and have occasional contact with others. Far from ignoring this opinion, the ALJ relied upon it in deciding that Johnson did not have enough adaptive functioning deficits to meet the Listing.

Johnson next contends that the ALJ erred by not using the Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition-Text Revision's (DSM-IV-TR) diagnostic tool to determine whether he had the necessary deficits in adaptive functioning. Johnson asserts that he satisfied the criteria laid out in the DSM-IV-TR because he was deficient in two areas—academic skills and handling money—so the ALJ should have classified him as meeting the Listing.

But when this court defined deficits in adaptive functioning as the "inability to cope with the challenges of ordinary everyday life," it did not require an ALJ to use a specific set of criteria like those found in the DSM-IV-TR when determining whether a claimant has necessary deficiencies under the Listing. See *Novy*, 497 F.3d at 710. Johnson acknowledges this and points to no other circuit that has established such an obligation. Further, even if Johnson satisfied the DSM-IV-TR test, it is still up to the Commissioner to decide whether he is legally disabled. See 20 C.F.R. § 404.1527(d)(2). The jobs identified by the vocational expert—dishwasher, hospital cleaner, and janitor—do not require academic skills or handling money. The ALJ determined that Johnson did not have the required deficits because he could maintain his hygiene, prepare simple meals, perform unskilled work, complete simple repetitive tasks and have occasional contact with others. Contrary to Johnson's characterization, this was not a "non-medical, gestalt-like test." The ALJ examined Johnson's ability to cope with the challenges of daily life, so he applied the correct standard under *Novy*, 497 F.3d at 710.

AFFIRMED