NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted December 10, 2020[*]
Decided December 30, 2020

**Before**

DIANE P. WOOD, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 20-1528

| | |
|---|---|
| KIMANNA WHITEHEAD, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Southern District of |
| | Indiana, Evansville Division. |
| *v.* | |
| | No. 3:19-cv-00071-MPB-RLY |
| ANDREW M. SAUL, | |
| Commissioner of Social Security, | Matthew P. Brookman, |
| *Defendant-Appellee*. | *Magistrate Judge*. |

### O R D E R

Kimanna Whitehead seeks Social Security disability benefits based on a host of physical impairments, including vascular disease, a hernia, and chronic pain. An administrative law judge denied her application, concluding, as relevant to this appeal, that the vascular disease was not a severe impairment and that she could do sedentary work. The district court affirmed. On appeal, Whitehead contends that the ALJ erred by

---

[*] We granted the parties' joint motion to waive oral argument; therefore, the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(C), (f).

(1) failing to explain why her vascular disease did not prevent her from sedentary work, and (2) improperly discounting opinions from her treating physician and a consulting physician. Because Whitehead lacks evidence of limitations caused by her vascular disease, and the ALJ's conclusion that she could work is supported by substantial evidence, we affirm.

## Background

Whitehead applied in January 2016 for Social Security benefits, alleging disability based on several ailments. She last worked as a patient account representative for a medical practice but quit because the stress adversely affected her health conditions. Whitehead's disability period lasted five years, from January 2012, her alleged onset date, until June 2017, her last date insured. *See* 20 C.F.R. § 404.130; 42 U.S.C. §§ 413, 423. But the record is not limited to evidence within the disability period. *See* 20 C.F.R. § 416.945(a)(1) (the agency considers all relevant evidence); *Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013).

## I.      Medical history

Whitehead based her disability claim on conditions including vascular disease, autoimmune hepatitis, hernia, osteoporosis, and back pain. We briefly summarize the medical records about these impairments, which are responsible for the bulk of her functional limitations.

*Vascular Disease.* In 2011, Whitehead was diagnosed by her primary care physician, Dr. Alexander Dela Llana, with peripheral vascular disease. She came to Dr. Dela Llana with ulcers on her left leg, a symptom of the disease. Dr. Dela Llana prescribed an antibiotic to help heal the ulcers. In 2016, Dr. Dela Llana found that Whitehead still showed symptoms of vascular disease.

*Autoimmune Hepatitis.* In 2012, Whitehead reported that she had had autoimmune hepatitis, a liver disease, for roughly four years. At the time, tests showed her liver function was near-normal, with slightly elevated levels of bilirubin (high levels are a sign of liver problems). In 2014, she was tested again, and her liver profile was problematic, though she reported no symptoms. For the next several years, she took medication for the hepatitis. Tests then showed that her liver profile was normal or slightly elevated.

*Hernia.* In 2012, Whitehead was diagnosed with a hernia in her lower abdomen and bowel based on a positive CT scan. Her bowel was not obstructed, which would have made the hernia significantly more dangerous. In 2015, after more than a year of significant abdominal pain, Dr. Todd Burry confirmed the diagnosis. Dr. Burry said that Whitehead's obesity may have contributed to the pain and that due to her obesity she was not a candidate for surgery. By mid-2016, her hernia was stable and no longer tender. She had no abdominal pain and had a normal appetite. A 2016 CT scan again confirmed that a large hernia was present, but it did not fully obstruct her bowel.

*Back pain.* At various times between 2012 and 2016, Whitehead reported severe back pain to Dr. Dela Llana—as high as 8 out of 10—which was aggravated by moving. Whitehead, however, had normal gait and station. Furthermore, in several other doctor's visits during that time period, she reported no back pain. By 2016, Whitehead reported constant back pain that radiated from her spine. Dr. Dela Llana prescribed hydrocodone for pain and a muscle relaxant and recommended exercise. In 2018, Dr. Dela Llana noted that Whitehead had no abnormal curvature in her spine and no nerve root irritation in her lower back. Although she could walk slowly without an assistive device, she had a limited range of motion in her back.

*Knee pain*. Whitehead also had knee pain but did not seek treatment separately from her back pain. A consulting physician diagnosed her with mild joint space narrowing and osteoarthritis in both knees based on x-rays in 2016.

Key to this appeal are two opinions from Whitehead's treating physician, Dr. Dela Llana. The first opinion is a letter written in 2016. In the letter, he lists Whitehead's medical conditions. He says that because of her hernia she has trouble walking more than two blocks, standing more than 20 minutes, and lifting more than 15 pounds. He concludes by opining that Whitehead "may not be able to preform (sic) her duties at work and she may not be able to find gainful employment."

Dr. Dela Llana's second opinion was a form entitled "medical assessment of physical residual functional capacity" that he filled out in 2018 for the purpose of Whitehead's administrative hearing. According to Dr. Dela Llana, in an 8-hour workday, Whitehead can stand for 1 hour and sit for 3 hours and must elevate her legs for more than 20 minutes more than once per day. She can carry less than 10 pounds. She cannot bend, squat, or crawl for work, but she can climb and reach within limits. She would not miss work for regular medical appointments. The form states that the

assessment describes Whitehead's functioning on or before June 30, 2017 (her last insured date).

Dr. Deborah Zygmunt, a consulting physician, also examined Whitehead in preparation for her hearing. Dr. Zygmunt confirmed she had a hernia going from her right abdomen to thigh. Dr. Zygmunt found the hernia interfered with her walking, but she was still able to walk unassisted. Dr. Zygmunt took x-rays and found that Whitehead had osteoarthritis in her knees and mild spinal abnormalities including a misaligned disc and lower back joint disease.

Dr. Zygmunt's assessment of Whitehead's ability to function is subject to different interpretations by the parties. She opined:

> In an eight-hour day, the patient can lift 8 to 10 pounds within one room. The patient is able to walk without assistive device for one block. She is able to stand for five minutes and sit for one hour. The patient's vision is intact with the use of corrective lenses and hearing is also adequate for normal conversation. The patient continues to have follow-up appointments with local professionals. The patient states she was recently told that she had stage IV autoimmune hepatitis and is not a transplant or surgical candidate.

According to Whitehead, Dr. Zygmunt meant that she can only stand for five minutes and sit for one hour *total* in a workday, while the Commissioner says the opinion means that she is limited to five minutes standing *at a time* and one hour sitting without a break to stretch.

Two agency physicians, Drs. Whitley and Sands, who did not examine Whitehead, also reviewed the medical evidence. They both opined that she was capable of light work. They proposed limitations that were less restrictive than Drs. Dela Llana or Zygmunt: that she could stand and sit each for 6 hours in an 8-hour workday; that she could occasionally lift up to 20 pounds; and that she had no environmental restrictions. But these doctors did not have the benefit of evidence submitted after April 2016 (Whitley) and September 2016 (Sands).

## II.     Procedural history

After the agency denied her application and declined to reconsider, Whitehead requested a hearing before an ALJ. In April 2018, she testified, represented by counsel. An independent vocational expert also testified.

The ALJ applied the standard five-step analysis, *see* 20 C.F.R. § 404.1520(a), and found that Whitehead was not disabled. At step 1, he found that she had not worked from her alleged onset date through her date last insured. At step 2, he found she had several severe impairments: a ventral hernia, autoimmune hepatitis, obesity, bilateral knee osteoarthritis, and mild lumbar spine disc degenerative disease. Though he recognized that Whitehead also has a history of hypertension, restrictive airway disease, peripheral vascular disease, and hypothyroidism, he concluded that these had only a minimal effect on her ability to work because they were being managed effectively; therefore, they were not "severe."

At step 3, the ALJ found that none of Whitehead's severe impairments, alone or in combination, were severe enough to meet or equal a listing of per se disabilities.

Finally, at step 4 the ALJ found that Whitehead had the residual functional capacity to perform sedentary work with additional relevant limitations: She can sit for at least 6 hours and stand/walk for about 2 hours out of an 8-hour workday. She can lift and carry less than 10 pounds frequently and more than 10 pounds only occasionally. She can occasionally climb ramps and stairs, balance, kneel, stoop, crouch, and crawl, but she must avoid climbing, driving, and workplace hazards.

In reaching these restrictions, the ALJ gave limited weight to the opinion of the reviewing doctors, Drs. Whitley and Sands, that Whitehead was capable of light work. He noted that evidence of her need for further restrictions was put forth at the hearing, specifically noting complications from her obesity. He also disagreed with their opinion that she had no environmental limitations. But the ALJ adopted their key finding that Whitehead could sit for 6 of 8 hours.

He also considered Whitehead's testimony about her current lifestyle, her self-reported symptoms and limitations, and her record of treatment. He found that the symptoms she reported may reasonably come from her medical conditions, but that the severity she claimed was not consistent with the record. He noted that she left her last job due to stress, but she did not allege any mental health conditions. He therefore

found that her hernia and other physical conditions had not prevented her from holding her most recent job. He further noted that her treatment records showed no worsening of her hernia or other medical conditions since that time.

The ALJ adhered to most of Dr. Dela Llana's 2016 letter but rejected his 2018 assessment. He gave some weight to the letter to the extent it was "consistent with restricting the claimant to sedentary work activity." All the functional limitations mentioned in the letter were part of the residual functional capacity finding. The ALJ, however, emphasized that he did not credit Dr. Dela Llana's opinion regarding Whitehead's ability to find work—a final decision left to the agency, not a physician. But he gave less weight to the 2018 opinion (which pertained to her condition in June 2017), finding that the more severe restrictions it outlined were inconsistent with Dr. Dela Llana's treatment notes and his 2016 letter.

The ALJ also discounted Dr. Zygmunt's opinion. The ALJ noted that Dr. Zygmunt saw Whitehead "for only one occasion in a non-treatment capacity." More importantly, her opinions were conclusory and "lack detail to support her findings." Nonetheless, he also found that Dr. Zygmunt's opinion was consistent with a residual functional capacity allowing no more than sedentary work.

Based on the testimony of a vocational expert, the ALJ therefore found that Whitehead was not disabled because she could do her past relevant work as a medical accounts representative, data entry clerk, or accounts-receivable clerk.

Whitehead sought judicial review, arguing that her peripheral vascular disease was a severe impairment and that the ALJ wrongly discounted Dr. Dela Llana's opinion. The district court ruled that substantial evidence supported the ALJ's decision. It found no error in the ALJ's treatment of Whitehead's vascular disease. It ruled that the ALJ was under no obligation to adopt any one medical opinion and he acted within his discretion in adopting part of Dr. Dela Llana's 2016 letter, discounting his 2018 form, and discounting Dr. Zygmunt's opinion.

## Analysis

This court reviews the ALJ's decision to determine whether it is supported by substantial evidence, or evidence a reasonable mind might accept as adequate to support a conclusion. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Furthermore,

the ALJ must "build a logical bridge from the evidence to his conclusion." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (internal quotation omitted).

## I.      Whether the vascular disease was severe and required more limitations

Whitehead first argues that the ALJ erred in not listing her peripheral vascular disease as a severe impairment (at step 2) and not considering her limitations from this ailment when determining her residual functional capacity (step 4). But the ALJ's findings—that her peripheral vascular disease does not more than minimally affect her ability to work and did not warrant further limitations in the restrictive functional capacity—are supported by substantial evidence.

As an initial matter, it makes little difference whether the vascular disease was listed as a severe impairment in step 2. A severe impairment can affect the final determination of disability in two ways: Either it can meet or equal a listed medical condition at step 3, in which case the claimant is per se disabled, or it is taken into account when determining the claimant's residual functional capacity at step 4. But all impairments, severe or not, must be considered at step 4. Whitehead does not argue that her peripheral vascular disease matches a listed condition. So the only real question is whether it was properly taken into account in determining the residual functional capacity.

Whitehead's primary argument here is unsound. She argues that the ALJ erred by failing to specifically address the vascular disease in determining her residual functional capacity. She cites several limitations in Dr. Dela Llana's reports that she claims stem—at least in part—from the vascular disease. Most importantly, she argues that the ALJ should have factored into her residual functional capacity her limitations on walking, sitting, and range of motion, and her need to elevate her legs—which she claims this disease caused, at least in part.

But there is only one discrepancy between the limitations Whitehead argues for and the limitations that the ALJ assigned: the need to elevate her legs. Whitehead now argues that her peripheral vascular disease is the reason she must elevate her legs regularly, as reflected in Dr. Dela Llana's 2018 form. As discussed later, however, the ALJ discounted this 2018 opinion because it proposed stricter restrictions than Dr. Dela Lana's 2016 letter without any explanation for the changes. There was no other evidence of a need to elevate her legs, owing to vascular disease or anything else. And that opinion makes no mention of her peripheral vascular disease at all, let alone as the

reason for elevating her legs. Whitehead points to no evidence in the record connecting the vascular disease and any need to elevate.

As for the other limitations Whitehead invokes, they were considered in step 4. The ALJ found credible the limitations mentioned in Dr. Dela Llana's 2016 letter, including those on standing and sitting. As a result, he ruled that she was capable only of sedentary work, not the "light" exertion that the consultants had recommended. It is true that he did not state that vascular disease in particular caused these limitations. His discussion focuses instead on her hernia, osteoarthritis, and spine abnormalities (any of which would also limit walking and sitting). But Whitehead admits there is no evidence connecting peripheral vascular disease to these (or any) limitations: "neither [Dr. Dela Llana nor Dr. Zygmunt] specifically state which limitations are attributable to peripheral vascular disease." And critically, Whitehead does not explain how factoring in an additional cause of the same limitations would have led to a different outcome. *Cf. Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("It is unclear what kinds of work restrictions might address Jozefyk's limitations … because he hypothesizes none.")

## II.     Whether the ALJ improperly discounted medical opinions

Whitehead next argues that the ALJ wrongly discounted the opinions of Dr. Dela Llana and Dr. Zygmunt. Whitehead's application was filed before March 27, 2017, so the requirements of 20 C.F.R. § 404.1527 apply. *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018). Therefore "[a] treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is consistent with other evidence in the record." *Id*. But an ALJ may discount the opinion of a treating physician, such as Dr. Dela Llana, if he provides good reasons for doing so. 20 C.F.R. § 404.1527(c)(2); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). The opinion of a consulting physician who personally examines the claimant, like Dr. Zygmunt, is also given more weight than non-examining sources. 20 C.F.R. § 404.1527(c)(1).

Whitehead argues that the 2018 form filled out by Dr. Dela Llana is entitled to controlling weight under the regulation, but the ALJ was justified in discounting it. The ALJ gave "good reasons" for his decision—in particular, discrepancies between the limitations listed in the 2018 form and the 2016 letter. The ALJ found the 2016 opinion, but not the one from 2018, adequately supported by several years of medical records. Whitehead replies that the changes may reflect deterioration over time—a possibility that the ALJ didn't discuss. But the opinions reflect a time difference of only nine

months (from the October 2016 letter to her last insured date in June 2017, the operative date for the 2018 letter). The conditions and medications that Whitehead now argues may have further burdened her in that span had been stable for years. And as the ALJ notes, none of the increased restrictions were explained on the 2018 form, nor were they corroborated by any recent tests or treatment records.

The ALJ also sufficiently explained why he did not credit Dr. Zygmunt's opinion. This is most important for the limitations Dr. Zygmunt proposed on sitting and standing, which Whitehead interprets as significantly more restrictive than those mentioned by Dr. Dela Llana or the reviewing consultants. The ALJ explained that they had a single appointment in a non-treating capacity and that the doctor's observations "lack detail to support her findings." As the ALJ noted, Dr. Zygmunt's examination notes do not illuminate how she reached the proposed limitations on sitting and standing.

In any case, the lesser weight given to Dr. Zygmunt's opinion is significant only if Whitehead is correct that the doctor concluded that she could "stand for five minutes and sit for one hour" total during an eight-hour workday. Sedentary work primarily "involves sitting" and requires "walking and standing…occasionally," 20 C.F.R. § 404.1567, so Dr. Zygmunt's restrictions as interpreted by Whitehead would be work-preclusive. The Commissioner insists that the opinion was that Whitehead could stand for five minutes at time and sit for one hour without interruption. The Commissioner has the better argument. Whitehead places inordinate weight on Dr. Zygmunt beginning the paragraph (two sentences before the key passage) with: "In an eight-hour day the patient can lift 8 to 10 pounds within one room." Whitehead argues that "In an eight-hour day" should be read into every sentence that follows, but the result would be nonsensical. For example, the next sentence says that Whitehead can walk only one block. This presumably means she can walk up to one block at a time without rest, not that one time in eight hours she can walk one block. Further, Whitehead's reading would mean that the consulting examiner set far greater restrictions than even those that Dr. Dela Llana proposed in the restrictive 2018 opinion: that Whitehead could stand for one hour and sit for three hours in an eight-hour workday. The Commissioner's reading is thus more consistent with the text and medical record.

Once Whitehead's implausible reading is set aside, she cannot point to any harm in the ALJ discounting Dr. Zygmunt's opinion on sitting and standing. The ALJ still found that the opinion is consistent with sedentary work at most, and that is the exertional level he ultimately selected. So even if he had given more weight to

Dr. Zygmunt's opinion (reasonably understood), he could still have found Whitehead capable of sedentary work.

Finally, Whitehead argues that the ALJ "played doctor" by assigning restrictions that did not match the opinion of any doctor. We note that Whitehead does not challenge any of the restrictions as inconsistent with the medical record (apart from the discounted 2018 Dr. Dela Llana opinion)—she argues only that the set of restrictions does not match any of the physicians' opinions. In general, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Here, the ALJ derived his restrictions from two main sources. First, he agreed with the reviewing doctors on several points where no new evidence had come to light between their opinions and the hearing. Most importantly, he adopted their daily sitting limitation which he found consistent with the medical record. It was also consistent with Dr. Dela Llana's 2016 letter—the second source for the ALJ's restrictions. The ALJ said he gave the letter "some weight," but the restrictions he adopted are fully consistent with it. In discussing the letter, he repeats each factual assertion—her medical conditions and her restrictions on walking, standing, and lifting—and takes no issue with them. He jettisoned only Dr. Dela Llana's ultimate conclusion that Whitehead may not be able to perform her past job or find gainful employment. This, he correctly says, is "an issue exclusively reserved to the Commissioner" and "not entitled to controlling weight or special significance." *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). The letter does not clearly articulate her restrictions in terms of an eight-hour day, but the walking, standing, and lifting restrictions are consistent with the ALJ's findings.

For these reasons, we AFFIRM the judgment.